All right. Attorneys, please, for the defense of the appellant and the appellee, please approach the podium and tell us who you are and who you represent. Your Honors, my name is Jeff Burkhart. I'm an assistant appellant defender, and I represent David Lewis Sito. Okay. State? Hello. Matthew Connors on behalf of the people of the state of Illinois. Each side is 15 minutes. I can assure you we've read the briefs, read the record such as it is, and so I don't need to go too much over the facts. Just right to your argument. Mr. Burkhart, hold on for a second. What's your last name? Robert Connors, common stuff. We are not related. Have I ever met you before? No. No. Thank you. Continue, Mr. Burkhart. May it please the court. My name is Jeff Burkhart. I'm an assistant appellant defender, and I represent David Lewis Sito. Your Honors, there are two issues before the court today. The first is the statutory interpretation of the term blade, as it's found in Section 5-33A-1. The second issue is whether the trial court erred when it mistakenly believed that unauthorized possession or storage of a weapon was an absolute liability offense, and based on that, struck the word knowingly from the Illinois pattern jury instructions here. Turning to the first issue, Your Honors, dictionary definitions, common sense, and case law all show that the term blade, as it's found in Section 5-33A-1, is an absolute liability offense.    pattern jury instructions here. Turning to the third issue, the statute prohibits the possession of any knife with a blade of at least three inches in length. And here, it's uncontested that flattened cutting edge was only two and seven-eighths of an inch, and that was it. So that's not enough for Mr. Sito to be convicted. Counsel, what's the definition of cutting? Your Honor, you mean the actual, the gerund, like cutting, like the actual verb? What you're advocating that cutting means. Your Honor, we don't take a stand in terms of the word cutting. I don't think we discussed it in our briefs, and neither did the State. But since the But you define a blade as a flat cutting edge. Correct, Your Honor. Now, it's the sharpened edge of the steel. It's the flattened cutting edge that's able to be sharpened, that's correct, to be able to cut. So by one-eighth of an inch, where there was a non-sharpened part, then it's Mr. Sito's view that that makes it a two and seven-eighths inch cut. Your Honor, the dictionary, again, dictionary definitions, common sense, and case law all show that only the cutting edge is what's used in determining what a blade is. Let's go to cutting sense, common sense, shall we? So we also know the statute in Illinois called armed violence, which also describes length of blades. And so you're saying it's a flat end. So under your definition, a serrated steak knife, which they tend to be serrated, would not be a knife at all. Would that be right? I don't believe that's correct, Your Honor. So even if you're looking at a serrated blade, you still have a flattened edge that's capable of cutting. You know, what we're talking about, this non-cutting part, is simply a part that normally, if you're, you know, whether it's a kitchen knife or a pocket knife or anything else, is actually a place where you place your index finger to control the blade better. So this is, again, it's totally different from the actual cutting part of the knife that was involved in this case or a serrated blade like you're discussing. So there's no concern, then, you know, whether it be in fencing or a knife. The concern should only be what the person could do, whether by slashing you. We should not be concerned at all whether or not the knife is suitable for plunging into somebody's chest. Because if you plunged a knife into somebody's chest, it would go up to the hilt, unless you punch it really hard, in which case the hilt will also enter the cavity. But is that correct? Well, Your Honor, actually, I mean, when you're talking about whether you could stab with this, I mean, there are any number of things you could stab with, whether it be a pen or anything else. But what we're concerned with is what the legislature is trying to regulate here. And what they regulated was a blade, you know, as you said, a handle could go in, any number of things. But what the legislature said was that a knife with a blade of at least three inches in length. So although there are other ways that we could, you know, we could speculate or imagine that harm could be caused, the concern that the legislature had was that... What was the knife, though? So speculate. It's a knife. So, again, knives are used to cut people and also to stab people, are they not? Well, Your Honor, the type of knife here is not used for stabbing normally. It's a legitimate tool that's... It should always be legal. All knives should be legal because the Alpens, they can gut fish. They don't have to gut humans. It's people who kill people, not knives. Well, Your Honor, you know, this is different from, you know, you were talking about stabbing. So the type of knife we have here, this is, again, it's not a dirk, it's not a dagger, it's not something that has two blades, you know, a blade on either, on both sides. This is something where you only have one cutting edge. It's a tool much like a kitchen knife or anything else. And it's not, again, this is not contraband outside of publicly funded buildings. So it's something that's legitimate to have outside of those areas. It only becomes illegal once you bring it into these areas. This accidentally happens pretty often in the Daly Center, according to the testimony here. Counsel, can a butter knife cut? Your Honor, a butter knife could cut. That's correct. So would that be included under the statute or not? Well, it would be, yeah, I believe it would be considered under the statute. But, again, I mean, would it have a flattened cutting edge? Would it be illegal to bring that into the Daly Center? You know, it becomes a little bit more difficult. I mean, of course, that's not the case we have. But I think if you have a butter knife, yeah, if you have maybe the flattened cutting edge and you measure that, again, I don't think most butter knives would have one, you know, much like the knife in this case. I don't think the blade would be in excess of three inches. But it is possible that the flattened cutting edge, if it were over three inches, that is a possibility, I believe. Was Mr. Sedo confined for 357 days? He was for 357 days. And then the sentence he received was 364 days for this pocket knife that he accidentally brought out of the Daly Center. That's correct. You mentioned the purpose of the statute. Now, the statute itself really has no legislative history as such, does it? It just was passed sometime in the 1970s. And I believe as the state brings up, well, that was a time of great uproar. And, gosh, the students were seizing public buildings, which they were. And it was designed to prevent apparently people to bring universities or schools. Is that correct? That's correct. The legislative history shows that this was focused on schools. And, actually, the kind of disruption that a gun or a knife, any of these objects, can cause in a school. Now, again, I mean, as far as the Daly Center and a pocket knife, we know that these cause so little disruption to the Daly Center that the officers here testified that when people bring these in, they tell them just to bring them back to their car or store them in the basement of the Daly Center and come back through security. So this is, again, not the type of activity that the legislature was focused on. Can you go on to, I'm sorry. Well, they have a repository where you can place this. But that wasn't offered to your client. That was not offered to our client. That's correct, Your Honor. Why was that? Well, in this case, they testified the reason that they didn't offer it to him was because they thought he was dressed strangely. And then he had a complaint about animal cruelty. And he had spoken with one of the officers working in the building before, but they found his dress and his language a little bit funny, and so they arrested him. So there really wasn't anything about the knife that was any different from any other pocket knife that's brought in the Daly Center. Counsel, when you say these knives cause so little damage, what do you base that on? Well, Your Honor, the testimony in this case, there were two officers, Sprouse and Garrett, that both testified that frequently people bring in bottles, knives, many things that are legal outside of the Daly Center, but illegal once you enter the Daly Center. So based on their testimony, we know that this was commonplace, that they weren't so concerned that they arrested every one of these people. In fact, they testified that normally, again, they either sent them back to their cars or had them stored in the basement of the Daly Center. In fact, at the time of this offense, there was a storage room just for these sort of things. Now there are UPay machines where you drop a couple of quarters in there, and you can see these in the basement of the Daly Center. You drop a couple of quarters in there, you can store whatever it is in the locker, and you go back through security. There's a list on those lockers that states what you can store there, and it includes pocket knives. But does it make a difference that they gave these people a pass or let them store things as opposed to citing all of them or arresting all of them for having them? Well, I believe it makes a big difference. In this case, I mean, there wasn't really anything about this pocket knife that was unusual. Mr. Cito wasn't making any threats. He has no history of violence. There wasn't any real reason to arrest him. Isn't this similar to the officer who stops somebody for speeding and says, well, I'll give you a pass this time? That's what these officers do at the door. They say, all right, we'll let you lock it up or bring it to your car. This gentleman, they did not. Well, Your Honor, this gentleman, and it appears that this is the only gentleman that they did not. Well, how do you know that? Well, we don't know exactly, but from the testimony of these officers, they say that what they normally do and then what they did in Mr. Cito's case, and they offered no other explanation. They offered no other examples of arresting somebody for this. Well, this is what two officers do and there's hundreds of officers that work at the Daly Center. Well, there are certainly more than just two. But, yeah, the two that were involved in this case stated what they normally do. Can we go on to the knowing part of it? Certainly, Your Honor. So the issue in terms of knowing, the trial court here believed that unauthorized possession or storage of a weapon was an absolute liability offense. Based on that, they struck the word knowingly from the IPIs. So there are three points I want to make. First, this is not an absolute liability offense. It's equally clear that this is a knowing offense. And, finally, this is reversible error in this case because Mr. Cito's misdemeanor case, one of the central issues was whether this was knowingly possessed. In addition to that, even though this was a misdemeanor, we have a jury that deliberated for two full days. All right. What was the signage on entrance? I'm sorry, Your Honor? What was the signage on entrance through the control where there would be hex rig? Your Honor, they testified that there were signs that listed some of the prohibited items, and I believe it did include knives. Did it include them generically or by specific description? I believe, if I recall, I believe it just simply listed knives among glass bottles and other objects. Other than stating knives, I don't think it went into specifics. Now, your client, Cito, tried the case himself. He did. Did he call himself a witness or did he just argue that he forgot about it? Well, he argued about this, but he also called himself a witness and testified it in the narrative. And was he cross-examined on it then? Yes, he was, Your Honor. That's correct. Now, what did he say about that, the knowingly? Well, his testimony was that he left his pocket knife in his backpack and just couldn't remember that he forgot that he had that, just like the glass bottle he forgot that he had in his backpack. There was a, in the record, there's a different description about this that an officer actually put his hand in his pocket, in Mr. Cito's pocket, and extracted the knife. Correct. What about that discrepancy? Well, so there was a factual discrepancy in terms of whether it was in his pocket or his backpack. Your Honor, regardless of whether it was in the pocket or the backpack, it's certainly possible that he didn't knowingly possess it. And the State wasn't held to that burden, though. The State didn't have to prove beyond a reasonable doubt that he knowingly possessed it. This is one of the central issues at trial. And, again, we had a jury that deliberated for two days on this. Well, but by changing the IPI instruction, by eliminating knowingly, made the case into a whole different case. It was an entirely different case by eliminating the word knowingly. You know, this was, I mean, when you go to, you know, first year of criminal law class in law school, the first thing you learn is that you have an actus reus and you have a mens rea. Now, one of those two things the State didn't have to prove in this case. And, again, we know this is not absolute liability. If you look at, you know, you only have absolute liability where you either have a clear indication that the legislature intended it or an important public policy favoring it. We don't have either here. In fact, the statute was silent. Where there's silence, you know, we can't assume there's absolute liability. In fact, Illinois courts must infer a mental state if at all possible. Now, looking a little bit more specifically, I'm sorry, go ahead. Was there, was there, he's obviously incarcerated. So part of determining what the intent is by the legislature on the statute is whether or not there's a criminal aspect to the conduct. Well, that's correct. In terms of misdemeanors, Your Honor, in terms of incarceration, you know, misdemeanors can be absolute liability offenses unless they're punishable by incarceration or a fine over $1,000. Now, we know that this offense was punishable by incarceration. In fact, Mr. Cito was incarcerated. So as a misdemeanor statute, this is an absolute liability. But, you know, looking at the type. I missed it. So even though this is a misdemeanor statute, we know that it's not absolute liability because this was punishable by incarceration. And if you look at the types of offenses where we do have absolute liability in Illinois, they usually fall into two categories. Either you have traffic offenses in Chapter 625 or you have regulatory offenses such as SOAR violations and things like that in Chapter 730. We don't have possession offenses. We don't have Chapter 730 offenses. We also know that this is knowing because Section 5-4-2 states that possession is a voluntary offense only if the defendant knowingly possesses it. And every possession offense that we've seen in the State of Illinois is knowingly. That's the mental state. The State hasn't offered any case to the contrary. But going back to what you earlier said with the colloquy with Justice Connors, in terms of discretion of police officers, hardly a day goes or hardly a week goes by when some important personage or recognizable personage is not arrested in an airport in America for having a handgun as they go through onto an airplane. And they invariably say, I forgot I had that in my pocket, in my carry-on, whatever. And yet from following this up, they're almost routinely convicted of it. Now, I think they plead guilty. We had a state senator just this month ago, and he pled guilty to having a gun in his carry-on bag. And I don't know if anybody actually thought the state senator knew he had a gun in his carry-on bag. And yet nobody's saying, oh, poor state senator. He should have been allowed to be let go because he forgot. Well, Your Honor, looking at a gun, certainly the size is much different, especially if it was something you had in your pocket or something like that. A pocketknife is very different. In a gun, carrying it around the streets of Illinois before you enter the Daily Center, that's a different thing. There you have other legal issues as opposed to a pocketknife, which isn't illegal until you walk into the Daily Center. I think some NRA people in our current legislature may disagree with you. That's correct. Because they just guess that everybody can carry a gun in their pocket. Apparently there are four down there. But, again, we know from the testimony, the state's own evidence in this case, that people do forget this, especially pocketknifes. And, again, it's a legitimate tool that people use for a number of reasons. And the record was preserved, even though he's acting pro se. Mr. Seitz was intelligent enough to say, I have to prove knowingly. I didn't knowingly do it. And then the state convinced the judge, you don't need knowingly, even though the IPI says you need knowingly. That's correct, Your Honor. He preserved it. He did a very decent job in terms of preservation. Counsel, at trial, was there any other testimony other than your client's testimony that I didn't know was in there or I forgot? No, Your Honor. There were other defense witnesses. But in terms of his mental state and whether he actually knew about this, nobody else could really testify to that. Nobody else did. That's the only testimony in the record relative to the knowledge. And so what about the suggestion that the jury just didn't believe him? Well, Your Honor, the jury didn't have a chance to even address this, really, since they didn't have the Illinois pattern jury instructions. And we know from case law in the State of Illinois that where this is an issue at trial, and again, this and the blade length, these were the issues. I mean, these were the issues at trial. Where this is an issue, it can't be harmless error. You know, in the State, again, I mean, in People v. Pollock, the Illinois Supreme Court stated repeatedly that the State must prove mental state beyond a reasonable doubt. You know, in that case, they had a non-IPI instruction that we used the word negligent instead of knowing. The Illinois Supreme Court reversed because the jury wasn't held to the task of finding the mental state. Now, at least in that case, they had a mental state, though. You know, here we just had absolute liability. You know, they didn't have any mens rea requirement. And again, Your Honors, the jury deliberated for two days. And again, I don't think there's any real debate here that the term is knowingly based on the statutes in this case, based on People v. Farmer, and based on the fact that the IPIs included the word knowingly, and they have for 30-plus years. And this is the first time this has ever come up, that somebody actually struck this from these jury instructions. What's the public policy issue here is that everybody would say, well, I just didn't know. This is a security device. It's a security measure. The officers who detained Mr. Cito did so on not just one factor, but for at least two others. So in order to keep a safe public, is it counterproductive to have knowingly as the standard when we're using this device to protect people? Well, Your Honor, I mean, as far as knowingly as the standard, I think that there isn't much wiggle room in terms of what the statutes and the case law states. But turning to public policy, and your point, you know, if it was that big of a deal to the officers at the Daly Center, they wouldn't be sending everybody to this storage area. You know, and they simply didn't give Mr. Cito that option. And could, you know, is it possible that this would be, you know, there would be kind of a slippery slope and everybody starts claiming that it wasn't knowing? Certainly that's a possibility, but at least they'd have a jury to determine whether they knowingly possessed it. He didn't have that here. You know, it's just not something, I mean, it was something he was guaranteed by law and something he didn't receive. So, you know, all of their public policy considerations, you know, the biggest thing here is that there was one of the two big elements of a criminal case that they didn't have to prove and that the jury didn't have to find. Your Honors, unless there are any further questions, we ask that based on the first issue that this Court reverses Mr. Cito's conviction outright, based on the second issue we ask that this Court reverses the remands for a new trial. One more question. I'm sorry, Your Honor, go ahead. Full disclosure. You cite two cases, the California case and the Nevada case that define what a blade is. Correct, Your Honor. And agree with your definition. That's correct. Are there any other cases that you found from any other state that describe it otherwise? There were three states that have dealt with this issue. One was California, one was Nevada, and the other one was Texas. And I cite the Texas case following my discussion of these first two. So Texas is kind of the outlier here. It's the only state that's kind of gone the other way on this. Thank you, Your Honors. Thank you. Mr. Connors? May it please the Court? Counsel? It's the people's position that as to the first issue, defendant was properly convicted of unauthorized possession of weapons beyond a reasonable doubt. Justice Connors hit the nail on the head with the defendant's argument when you asked, how do you define cutting? Why are we focusing on cutting? On page, I believe it's 17 of the defendant's opening brief, he specifically tries to exclude stabbing as an option. However, the statute itself doesn't include knives for the sole purposes of cutting. The plain language of the statute includes items such as dirks, stilettos, switchblades, axes, hatchets, or other deadly or dangerous weapons or instruments of like character. So there's no need to have a confined and narrow definition of a knife. There's no need to have somebody parsing out a map of a knife and saying, well, this portion looks like it could be used to enter, but it can't proceed any further. Justice Quinn, also you commented, if a defendant were to make an entry into a victim with a knife, it's not going to stop just because that portion of the blade is dull. He would follow all the way through until that knife enters, all the way up until the hilt or even past it. So what is the common sense definition? The common sense definition is a knife has two component parts, a handle and a blade. How do we know that? Well, we look at what happened in this case. We had two different officers who saw the knife and measured it. Both of them measured the knife in the same way, came to the same conclusion, and that is the knife blade was 380 inches long. They measured the knife. They came to the same conclusion and determined this was prohibited by the statute. There was a question about, well, why was defendant brought up? Why was defendant the person that happened to be unlucky enough to get arrested? This wasn't a case about animal cruelty or being dressed weirdly. Defendant indicated he was on his way up to the sheriff's office. He'd been able to talk to the sheriff. He was armed with a knife and said, I'm here to see somebody about sodomizing my cats. This isn't your run-of-the-mill interaction between a citizen and a member of the security team at the Daly Center. This is somebody who was intending to go someplace and was armed with a weapon. Based upon those conclusions. It is a pocket knife, though, right? I mean, so it's not like, you know, it's not a Hitler used knife. It's a pocket knife, a fold-up pocket knife. It is a fold-up pocket knife, but to the extent that the legislature has the determination to determine what length they choose to draw the line, in this case they chose three inches. So the defendant purchased a knife that was in excess of a three-inch blade. He can't say, well, because there's more egregious knives out there, somehow I'm less culpable. The legislature has taken a stand to say, this is the dividing line. Address knowingly, if you would. The knowingly question comes about basically because when the parties were preparing the jury instructions, the state first recommended that the jury instructions need to be modified because it didn't include the phrase public lands. So while counsel has commented that these instructions have been in existence for close to 30 years, they were not an accurate statement of law, at least to that fact. So the circuit court was questioned. We need to modify the IPIs. There was no objection to including the term, okay, striking, I believe it was state funds, and they said public lands. Then the prosecutor indicated, there is no knowingly in the statute. And the circuit court's quote was, I'm going to follow the statute as it is written. That word knowingly does not appear in the statute. So the question before this Court is whether the circuit court abused its discretion when it looked at the statute and didn't see that word knowingly. Well, no. All right. So it's not whether he saw it or not. The issue is, did he violate his discretion, abuse his discretion, in making this an absolute liability offense? Correct. Would you agree with that? Yes. Characterization. So this should be an absolute liability offense. And why is that? First of all, we have, as the Court noted, a legitimate reason to keep places of public access and thoroughfare safe. It's not just universities and school campuses in the 60s that are in rebellion. This is the day-to-day building where courts, judges, lawyers, all these people work on a daily basis. Do we want people armed with, and again, it's a very narrow list of people. It comes with rifles, pistols, shotguns. And then you get down into a certain subset of stabbing or knives, such as dirks, daggers, switchblades. The legislature has crafted a very small list of weapons that are, for lack of a better phrase, dangerous weapons or instruments, which can be used to cause great harm. So then we look at, okay, there's a stated public policy. We have a limited amount of weapons that are being targeted. And we have a misdemeanor offense. So while the state does concede that he was subject to jail time for this, this is not one of those cases where we can say, because of the amount of jail time, we can presume the legislature would not intend an absolute liability offense. Well, let's go to that, because I don't know if it's clear from the record. So Mr. Saitu ended up serving, what, 357 days in jail? Yes. That's right. He never made bond. It is my recollection, and I believe the record will establish, that Mr. Saitu was also being held on an additional charge during the pendency of this case. He was being charged on a felony telephone harassment of a public official that was tried out of the Skokie Courthouse, I believe. So at such point in time, yes, there were multiple pending charges. As the Court is well aware, the record is replete with handwritten documents outlining why he should have posted bond on various charges, as to why he was not able to post bond on this. And that's okay, as long as there's other charges. Yes. And when the Court removed, didn't use the IPI instruction and removed knowingly, the jury sent a note to the trial judge saying, quote, Your Honor, after discussion and several votes, we cannot reach a unanimous decision, end quote. And later, the State noted, quote, The jury deliberated for quite a long time on this, and they took it very seriously, and they didn't come back in ten minutes with a verdict. They deliberated over a weekend into the next day, and for the majority of that Monday as well, end quote. Now, does then that indicate some confusion on the part of the jury, that if the judge had used the IPI instruction unknowingly, it would have allowed them to come to a decision more quickly? To try to glean what the jury was hung up on in this case would be speculation. The defendant put forth an approach that he had a Second Amendment right to carry not only this knife, but a firearm. The question is, you had a jury that told the judge they were having a problem coming to a unanimous decision. The idea is, if you take out the IPI instructions are to facilitate juries, and instructing them is how they're to do it. When you take out knowingly, then you have a different dynamic in that jury room in terms of the discussion of the jurors. Yes, Your Honor. You are absolutely correct if the statute includes a knowing mental component. And in this case, it's the people's position that it doesn't have that component. Because of the fact that you do have a limited amount of punishment, because it is a misdemeanor offense, because there is a public policy goal of keeping public places safe, we can say that this was an absolute liability offense. Well, our Supreme Court has held that there is no such compelling interest in keeping our prisons safe, which I would suggest if anybody is to be dangerous, it wouldn't be somebody over at the Daly Center where there are no criminal courts remaining other than traffic. But our maximum security prisons, you are allowed to argue, I didn't knowingly bring in contraband. Yes. And, in fact, in the statute, it's referred to by defendant in the people versus farmer, the possession of contraband statute includes the term knowingly, and then for bringing contraband into the penal institution. And then subsection B says a person may be convicted regardless of the intent for which they possess that contraband. So you do have in that subset the term knowingly appearing. And then in subsection B, you do have without regard to the intent. So in that case, without regard to intent is not meant to equalize to a knowing mental state. It's to get rid of an intent provision. So that way an inmate cannot say, I had a shank in my pocket, but I didn't have intent to hurt anybody with it. So in that case, you do have within the same given statute, in subsection A, a knowing mental state, and B saying you don't need to have a specific criminal intent to accomplish, to accompany that possession. So any statute that doesn't have the word knowingly in it, we can conclude is an absolute liability? No. That is not the people's position. In fact, the courts have said that you are not required to always assume silence equates to a lack of mental state. They say on those occasions where the statute is silent, they will presume a mental state unless there is, and you can follow along based upon legislative procedure, language of the statute, or in this case, look at the punishment of the offense. Can you cite another absolute liability offense that is not already attached to a felony, where you can get 364 days in jail for something you didn't know you did? You have the criminal cases of the driving offenses cited in the people's brief, where a person who is driving in his car on a conviction for driving under the influence of alcohol can be subject to 364 days in custody for driving under the influence of alcohol. There is no knowing mental state required for that. People cited people versus Molnar in their brief indicating the failure to adhere to SOAR registration, which is actually a class four felony, is an absolute liability offense. So this isn't an unprecedented expanse of state power. These decisions, these statutes do exist, and for that purpose, people submit that this should be considered as one of those. Well, I guess the question goes to, I'm sorry. No, go ahead. Why would we do this? Why would we want to let trial courts modify the IPI to remove an element that was put in by the criminal IPI committee, in this case, knowledge, especially in a case like this, where a person who has a knife, whether it be in their pocket or in their knapsack, and they choose to try the case themselves, that we should change the rules of the game or the rules of law to make sure that the jury does the right thing. The only thing they're allowed to do in this case is to convict him, because there's no question at the end of the day he possessed the knife. He didn't deny possessing the knife. He argued he didn't know it. And so now the laws, at the end of the day, in the instruction conference, the state tells the judge, don't let the jury decide whether or not he knew it, which was his defense all along. Why would we want to do that? What's the upside for the court system to allow that to occur? The upside for the court system is to demonstrate that when the IPI is an inaccurate statement of law, that because it is presented in this fashion, it doesn't preclude it from being revisited or viewed correctly. So merely the fact that the posture that this case is presented in doesn't vitiate the fact that if this is an absolute liability offense, which the people submit that it is, that doesn't prevent this court from saying it's an absolute liability offense, the defendant happened to have tried his own case, the defendant happened to have chosen not to be retained by counsel. The defendant preserved the issue, presented an argument. That argument isn't available. Well, let's take the next step then. Let's assume he had a public defender or any other defense lawyer. And I bring up public defenders because I think they're the best criminal defense lawyers I've ever seen. And I did that for 18 years. What would a defense attorney know to do that Mr. Saitu didn't know? Won't they argue knowledge the whole way through? Because their client is going to testify and say, I had the knife. So if it's an absolute liability offense, there's no sense in having 12 jurors decide that. They're going to argue knowledge. They have to argue knowledge, lack thereof. And then at the instruction conference, they're told, ah, you know, we're not letting you argue what's in the IPI. We don't like the IPI. Go to trial without it. That element is subsumed. And if the court is troubled by the fact that the IBI creates an element that is not found in the statute, then the question is whether or not the ruling made by the circuit court preventing that defense is somehow harsh. The question is whether or not the legislature intended to create an absolute liability offense. The question of whether or not. And the evidence you have of that, your argument based on that, is the fact they didn't say anything about it. Right? It's not that this is an absolute liability offense. Correct. The defendant even focuses on his brief that there wasn't a proviso in the statute which says, this is an absolute liability offense and we require that. That's never been held to be a requirement before. This court has language which has been indicated to say in the absence of a specific intent provision, the court may interpret that and add a mental state. It's never been held that it must. Counsel, can I ask you as far as the effective date of this piece of legislation and the effective date or when the last time the IPI was updated, do you know those various dates? I don't have it offhand. I know that the IPI was not amended. The IPI was not amended to reflect the last amendment to include public lands versus state and federal supported lands. I'm just wondering as far as the knowingly part. There had never been any mention of that before. It had never been litigated. Never in the statute. Correct. The issue of knowingly had never been litigated previously to this either. But my point is it was never in the statute, but it was always in the IPI? Correct. In the People v. Gene 143 Ill Second 281 in 1991 case, the Supreme Court stated that the committee comments to Section 4-9 revealed that the legislature intended to limit the scope of absolute liability. This section is intended to establish as an expression of general legislative intent rather strict limitation upon the interpretation that mental state is not an element of an offense, although the expressed language of the provision defining that the offense fails to describe such an element. It goes on to say the second part of Section 4.9 expresses the policy that an other offense is not including a mental state in the definition. Only a clearly indicated legislative intent to create absolute liability should be recognized. And in all other instances, a mental state requirement should be implied as an application of the general rule that an offense consists of an act accompanied by a culpable mental state. It concludes, as is evident from the committee comments quoted above, either a clear indication that the legislature intended to impose absolute liability or an important public policy favoring it, this court has been unwilling to interpret a statute as creating an absolute liability offense. Are you aware of any case that supersedes this? No, Your Honor. There is no case which indicates that is not good law. But that case does not preclude absolute liability offenses, as demonstrated by the fact that People v. Molnar, which they believe is cited in the People's Brief, was decided after that case and held it was an absolute liability offense. So while the People can see that that is a valid expression of the legislative intent of those cases, it does not preclude a finding. If there are no further questions, People ask for these reasons all those stated in the Brief that we affirm defendant's conviction. Thank you. Thank you. Mr. Hale. I'm sorry, Mr. Burkhart. Your Honor, the State hasn't cited a single thing to show that this offense is absolute liability. You know, they talk about other absolute liability offenses, but there's nothing pointing to this one being one. You know, again, we know from several cases, Molnar, Valley Steel, In Re KC, that this is not absolute liability. Even though it's a misdemeanor, it's punishable by incarceration. It's a possession offense, and we know that possession offenses are knowingly based on Section 5-4-2 and based on People v. Farmer. Briefly, the State also noted that there's an interest in preventing people from bringing in weapons into a courthouse. That doesn't make it absolute liability. Your Honors, we have an interest in every criminal statute in the State of Illinois. But as you know, there's a very small number of statutes that are absolute liability. We have an interest in preventing murder and sexual assault. Those aren't absolute liability. So the interest in preventing those sorts of things doesn't lead to the conclusion that there's absolute liability. Your Honors, as far as the IPIs, People v. Pollock stated, this is the Illinois Supreme Court stating, that they're painstakingly drafted with the use of simple, brief, and unslanted language. And based on the Illinois Supreme Court Rule 451A, we know that IPIs have to be used unless they're inaccurate. Here, they're not inaccurate. Briefly, turning to the issue in terms of the word blade, Webster's Dictionary of American Heritage, Oxford American Dictionary, they're all cited in our brief. All these point to a blade being the flat cutting edge of a knife. And that's it. Dictionaries are the primary tool that Illinois courts use to interpret these terms. The State hasn't offered a single definition of the contrary. And then briefly, just to address a couple of the comments by the State, in terms of him being concerned about cat sodomy, the reason he was concerned about this, it wasn't an action, as I think the State made it sound like, that he had taken. He was concerned that people were actually abusing his pet. And that's why he went to the courthouse that day. As far as the State's testimony, sorry, the officer's testimony for the State, that this blade was three and one-eighths of an inch, this is not a factual issue. This is a legal issue. They admitted that they were measuring just the flat and cutting edge, or sorry, the entire thing past the handle to reach that number. There's no contest, there's no question that only the flat and cutting edge was two and seven-eighths of an inch. But what they testified to in terms of what they believe is the blade isn't up to the officers. This is a legal interpretation, statutory interpretation issue for this Court. Finally, Your Honor. Are the photographs of the blade next to the ruler sufficient to make this determination? Your Honor, they are. The photographs of the blade next to the ruler show this. But also the testimony by the officers. You know, they admitted on cross-examination that they included this non-cutting portion in that measurement. So there is no issue, factual issue here. So in terms of the first issue, again, we ask that this Court reverse outright. The State's simply asking this Court to stretch the plain and ordinary meaning of the term blade. We're asking this Court to stick with dictionary definitions, case law, and common sense. In terms of the second issue, again, we're asking this Court to reverse the remand for a new trial. It's clear this is not absolute liability. It's equally clear this is a knowing statute based on both Section 5-4-2 and People v. Farmer. And it's equally clear that this is reversible error. We had a jury in a misdemeanor case that deliberated for two days and sent a note to the jury. So, Your Honors, unless there are any further questions. It's part of an observation. Let's say we agree with you, not on the first issue, but on the second issue, remand, reverse and remand for a new trial. Based on just what we know about this case, confining ourselves to the briefs. If that case gets set down, a circuit court judge of Cook County is going to hear the case. They're likely to set a bond on this matter, even though he's served every day of any possible sentence, based on his background. It is likely, I don't want to guess what they're going to do, but it could be bad for your client in terms of his custody. Any suggestions? Well, Your Honor, I've discussed the possibilities with my client about what happens upon retrial. We agreed to proceed despite that. Okay. I'm not warning you. Oh, no, no. We're here. We're glad for the work. But we have discussed. It's a concern. Certainly. As long as you and your client know about it. We have discussed the possibility of remand. Good job. Thank you, Your Honor. Thank you for the briefs. Thank you for the arguments. This case will be taken under advisement and this court will be adjourned. Thank you.